**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Case No. 15-cv-00146-RM-KMT

PIOTR AURZADNICZEK,
JAMIE BEARD,

      Plaintiffs,

v.

HUMANA HEALTH PLAN, INC.,
HUMANA INSURANCE COMPANY,

      Defendants.

---

**OPINION AND ORDER**

---

On March 2, 2015, plaintiffs Piotr Aurzadniczek ("Aurzadniczek") and Jamie Beard ("Beard," with Aurzadniczek, "plaintiffs") filed an Amended Complaint against defendants Humana Health Plan, Inc., Humana Insurance Company (collectively, "defendants") and eHealthInsurance Services, Inc. ("eHealth"), asserting the following ten claims for relief: (1) breach of contract against defendants and eHealth; (2 to 4) reformation, claim for benefits under reformed contract, and breach of a reformed contract against defendants; (5) negligent misrepresentation against defendants and eHealth; (6 to 7) common law and statutory bad faith against defendants; (8) willful and wanton breach of contract against defendants; (9) violation of the Colorado Consumer Protection Act ("the CCPA") for multiple deceptive trade practices against defendants and eHealth; and (10) loss of consortium against defendants. (ECF No. 27.)

On March 16, 2015, defendants and eHealth each filed separate motions to dismiss the respective claims raised against them in the amended complaint, pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)").  (ECF Nos. 41, 42.)  Plaintiffs filed responses in opposition to both motions to dismiss (ECF Nos. 45, 46), and defendants and eHealth each filed replies (ECF Nos. 55, 58).  After referral, U.S. Magistrate Judge Kathleen M. Tafoya entered a report and recommendation ("R&R"), recommending that (1) eHealth's motion to dismiss be granted in full; and (2) defendants' motion to dismiss be granted in part and denied in part.  (ECF Nos. 51, 66.)

Shortly after entry of the R&R, plaintiffs and eHealth stipulated to the dismissal of all claims against eHealth, and eHealth was then terminated as a party to this action.  (ECF Nos. 67, 68.)  As a result, the Court finds eHealth's motion to dismiss, as well as the Magistrate Judge's recommendations with respect thereto, to now be moot.  As such, the Court DENIES eHealth's motion to dismiss as MOOT.  The same is not the case for defendants.  (*See* ECF No. 67.)  As such, both defendants and plaintiffs filed objections to the R&R,[1] as well as responses to the objections. (ECF Nos. 70, 71, 78, 79.)[2]  Accordingly, defendants' motion to dismiss and the R&R with respect thereto are now before the Court.

---

[1] In the title of their objections, defendants request oral argument.  (ECF No. 71 at 1.)  That request is DENIED, as the Court is able to resolve the objections based on the record alone.

[2] Plaintiffs have also filed a reply to defendants' response to plaintiffs' objections, purportedly pursuant to Fed.R.Civ.P. 72(b) ("Rule 72(b)").  (ECF No. 81.)  Rule 72(b), however, does not countenance a reply to a response to a party's objections.  *See* Fed.R.Civ.P. 72(b)(2) (providing for a party filing objections to a report and recommendation, as well as a party responding to the same).  Given that plaintiffs did not move for leave to file their unauthorized reply, the Court declines to consider it.  In any event, other than with respect to an objection as to when the Magistrate Judge found that plaintiffs received a copy of their insurance policy—an objection that should have been raised in plaintiffs' objections to the R&R—the reply merely restates for at least the third time the same arguments and responses to defendants' arguments that have been stated previously in plaintiffs' response to defendants' motion to dismiss and their objections to the R&R.

## I.     Legal Standard

In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135-36 (10th Cir. 2014); *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010).  In doing so, "a court may look both to the complaint itself and to any documents attached as exhibits to the complaint." *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001).  In the complaint, the plaintiff must allege a "plausible" entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-556, 127 S.Ct. 1955 (2007).  A complaint warrants dismissal if it fails "*in toto* to render [plaintiff's] entitlement to relief plausible." *Id*. at 569 n.14.

## II.    Review of a Magistrate Judge's Report and Recommendation

A district court may refer pending motions to a magistrate judge for entry of a report and recommendation. 28 U.S.C. §636(b)(1)(B); Fed. R. Civ. P. 72(b).  The court is free to accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(3).  A party is entitled to a *de novo* review of those portions of the report and recommendation to which specific objection is made. *See* Fed.R.Civ.P. 72(b)(2), (3). "[O]bjections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30 St.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Furthermore, arguments not raised before the magistrate judge need not be considered by this Court. *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

3

### III.     Factual Background

Defendants do not challenge the Magistrate Judge's recitation of the factual background, as gleaned from the amended complaint and the documents referenced therein or attached thereto. (ECF No. 71 at 2.)  In their *objections*, neither do plaintiffs.  In their objections, plaintiffs do set forth a statement of facts section.  (ECF No. 70 at 2-6.)  Nowhere in that section, though, do plaintiffs challenge any of the factual findings made in the R&R.  (*See id.*)  Instead, as well as asserting factual statements from the amended complaint, plaintiffs use it as an opportunity to make legal conclusions. (*See, e.g.*, *id.* at 3 ("This title would not put a reasonable person of ordinary intelligence on notice and did not put Beard on notice the paragraph would contain a policy limitation."))  Thus, in plaintiffs' objections to the R&R, the Court does not discern any specific objection to the factual background set forth in the R&R.  *See* Fed.R.Civ.P. 72(b)(2); *2121 E. 30 St.*, 73 F.3d at 1060.

As discussed *supra*, in an unauthorized reply to defendants' response to plaintiffs' objections, plaintiffs appear to raise an objection to the Magistrate Judge's finding that plaintiffs received a copy of their insurance policy in a letter sent to plaintiffs on December 14, 2013.  (*See* ECF No. 81 at 4-6.) Even if the Court were prepared, which it is not, to consider plaintiffs' reply, this objection does not *reply* to anything in defendants' response.  Rather, it raises an objection to the R&R; something which should have been raised in plaintiffs' objections to the R&R.  Because they failed to do so, the Court declines to consider this argument.  In any event, even if the Court assumed that plaintiffs did not receive a copy of their insurance policy through the mail before December 19, 2013, as they allege (*see id.* at 5), this would make no difference to the Court's findings and conclusions herein.

As a result, the Court ADOPTS the Magistrate Judge's factual background in full.

## IV.    The Magistrate Judge's Recommendations

The Magistrate Judge recommended granting defendants' motion to dismiss with respect to Claims Two, Three, Four, Five, Eight, and Nine of the amended complaint,[3] while denying the motion to dismiss with respect to Claims One, Six, Seven, and Ten.[4]

## V.    Discussion

### A.    Claim One—Breach of Contract

Both parties object to the Magistrate Judge's reasoning and recommendation with respect to Claim One. Before reaching those objections, though, it is important to understand a few pertinent facts as alleged in the amended complaint. On December 10, 2013, plaintiffs were approved for health insurance through defendants, and, at the very least, some form of coverage began on that date. (*See* ECF No. 27 at ¶¶ 8, 10.) On December 19, 2013, Aurzadniczek visited a doctor because he felt a lump on his left testicle, and, on the same day, Aurzadniczek received a scrotal ultrasound, revealing a mass on his testicle. (*Id.* at ¶¶ 13, 14.) Aurzadniczek was scheduled for surgery on December 20, 2013, but, because his provider was "unwilling[ ]" to perform the surgery due to the

---

[3] The conclusion section of the R&R actually states that the Magistrate Judge recommended denying the motion to dismiss with respect to Claim Eight. (ECF No. 66 at 29.) However, the Court considers this to be a typographical error, given that, in the discussion part of the R&R, the Magistrate Judge explains why Claim Eight should be dismissed. (*See id.* at 25.) In addition, in their objections, the parties assume that the Magistrate Judge recommended dismissing this claim. (*See* ECF No. 70 at 19-20; ECF No. 71 at 11-12.) Therefore, the Court will treat the R&R as recommending dismissal of Claim Eight.

[4] Although the Magistrate Judge recommended denying the motion to dismiss with respect to Claim One, the explanation for that recommendation only reaches the alleged breach of contract regarding plaintiffs' claims for benefits after December 25, 2013. (*See* ECF No. 66 at 24.) The breach of contract claim, though, also relates to claims for benefits between December 10 and December 25, 2013. (*See* ECF No. 27 at ¶ 16.) In addition, in their objections, the parties assume that the Magistrate Judge's recommendation with respect to Claim One only covers those claims submitted after December 25, 2013. (*See* ECF No. 70 at 6; ECF No. 71 at 3.) Therefore, the Court will treat the R&R as recommending dismissal of Claim One in part with respect to claims for benefits before December 26, 2013, and denial of dismissal in all other respects.

"purported December 25, 2013 sickness effective date" in Aurzadniczek's insurance policy, the surgery was rescheduled for after December 25, 2013.  (*Id*. at ¶ 14.)  Aurzadniczek received additional care for his condition from December 26, 2013 through March 14, 2014.  (*Id*. at ¶ 15.) Aurzadniczek then submitted 93 claims to defendants related to the treatment and care he received from December 19, 2013 through March 14, 2014.  (*Id*. at ¶ 16.)  Defendants denied three claims for services rendered on December 19, 2013, because those services were performed prior to the sickness effective date.  All of Aurzadniczek's remaining claims were also denied, this time though because the services rendered were related to a pre-existing condition.  (*Id*.)

In this light, with respect to the breach of contract claim, there are two issues: (1) whether defendants breached the insurance policy in denying Aurzadniczek's three claims for services rendered on December 19, 2013 because they occurred prior to the sickness effective date of the policy; and (2) whether defendants breached the insurance policy in denying all of Aurzadniczek's remaining claims because they related to services rendered for a pre-existing condition.  Resolving these questions requires interpreting, respectively, the sickness effective date and then the pre-existing condition provision of plaintiffs' insurance policy.

With respect to the first issue, the Magistrate Judge found that the sickness effective date was truthfully set forth in an application ("the Application") that plaintiffs submitted to apply for health insurance through defendants, and the date also "featured prominently" on the first page of plaintiffs' insurance policy.  (ECF No. 66 at 10, 12.)  Thus, although it is not specifically stated in the R&R, it appears that the Magistrate Judge found that plaintiffs' breach of contract claim with respect to services rendered before December 26, 2013 did not state a claim.  (*See id*. at 24.)

6

With respect to the second issue, the Magistrate Judge did not find the insurance policy to be quite as clear.  Specifically, in interpreting the insurance policy's definitions of "pre-existing condition" and "effective date," the Magistrate Judge found that a reasonable interpretation of those terms was that the effective date, for purposes of pre-existing conditions, was December 10, 2013. (*Id*. at 22.)  The Magistrate Judge rejected defendants' interpretation of the terms, finding that they would require reading the word "sickness" in to the definition of pre-existing condition "where it does not actually appear."  (*Id*. at 23-24.)  The Magistrate Judge found that, at the very least, the terms were ambiguous, and thus, construed them against defendants as the drafters of the insurance policy.  (*Id*. at 24.)

The Court agrees with the Magistrate Judge as to both issues.  First is the applicability of the "sickness effective date" language in the insurance policy.  In their objections, plaintiffs fail to make any specific objection to the Magistrate Judge's finding that the breach of contract claim was cognizable as to only services rendered after December 25, 2013.  In this regard, the only statements that plaintiffs make are that: "the breach of contract claim should stand as to all claims [for benefits]," and "[t]he Magistrate Judge failed to analyze the breach of contract claim as to the care prior to the sickness date."  (*See* ECF No. 70 at 6, 12.)  These are not specific objections, and certainly give the Court no indication of how the Magistrate Judge may have erred.  Thus, the Court could adopt the Magistrate Judge's finding in this respect without further review.  *See* Fed.R.Civ.P. 72(b)(2); *2121 E. 30 St.*, 73 F.3d at 1060.  However, for the sake of completeness, the Court will explain why it agrees with the Magistrate Judge's finding.

First, the sickness effective date is clearly set forth in the Application.  At various moments, plaintiffs have argued that the sickness effective date was "buried from view in small print deep

within the [A]pplication." (*See, e.g.*, ECF No. 70 at 9.)  This is simply not the case.  The Application is five pages in length.  (ECF No. 45-1.)  Thus, to say anything is buried "deep" within it is stretching the meaning of deep burial.  This is especially the case here where four of the five pages of the Application are questions to be completed by the applicant.  (*See id*. at 1-4.)  The only page containing language that could be deemed contractual is on page five of the Application, and this language takes up two paragraphs immediately preceding the applicants' signatures.  (*See id*. at 5.)  As for plaintiffs' contention that this language is in "small print," the Court notes that the print size is, at worst, merely exactly the same as all of the other text in the Application, including the questions.  (*See generally id*. at 1-5.)  Thus, to suggest that the print is small is a stretch unless all of the text in the Application, including the questions that plaintiffs had no alleged problem reading and answering, is also considered "small print."

The core of plaintiffs' argument, though is the implication that the language in question is part of the fine print; where contractual exclusions or limitations usually go to hide.  (*See* ECF No. 70 at 9, 15, 17.)  Again, that does not reflect reality.  The paragraph containing the sickness effective date may be relatively long, contain numerous acknowledgments and agreements, and not look that much fun to read, but it is in no sense part of the "fine print."  *See* Black's Law Dictionary 750 (10th ed. 2014) (defining "fine print" as "[t]he part of an agreement or document — usu. in small, light print that is not easily noticeable — referring to disclaimers, restrictions, or limitations.").  Rather, the paragraph is perfectly noticeable; it is at the top of the page, it immediately follows the heading "Agreement and Signature" and the sub-heading "True and Complete Acknowledgment," and, as stated *supra*, the text is neither small nor light, at least not in comparison with the rest of the Application's text.  (*See* ECF No. 45-1 at 5.)  Moreover, the paragraph immediately precedes the

space for the applicants' signatures.  (*Id.*)  In other words, in order for an applicant to sign the

Application, the applicant either has to read the paragraph containing the sickness effective date or

ignore it.  There is simply no other reasonable way to consider the placement of the paragraph.  The

mere fact that plaintiffs, as they concede (ECF No. 70 at 14), did not read the paragraph does not

mean that it was not noticeable.

That is the Application.  If there were any doubt, the insurance policy makes it even clearer

that (a) there was a sickness effective date, and (b) the sickness effective date was December 25,

2013.  That much was plainly noticed to plaintiffs on the first page of the policy.  Specifically, the

opening page stated that there were two effective dates for coverages under the policy.  The first

effective date was December 10, 2013 for bodily injuries; the second effective date was December

25, 2013 for sicknesses.  (ECF No. 27-2 at 2.)  If that were not enough, later in the policy, in the

"Schedule of Benefits" section, matters are given even more clarity.  Specifically, under the sub-

heading "Coverage Information," the policy stated that plaintiffs' benefits for bodily injury and

sickness would take effect on December 10 and December 25, 2013, respectively.  (*Id.* at 16.)

Finally, in the "Definitions" section of the policy it stated that "[t]he effective date for sickness will

always be on the 15th day after the effective date for bodily injury unless amended." (ECF No. 27-5

at 20.)

Plaintiffs do not argue that this language is not perfectly clear and noticeable on its face.

Instead, plaintiffs argue that they were under no duty to read their insurance policy.  (ECF No. 70

at 9-10, 14.)  In this regard, plaintiffs argument is two-fold.  First, because plaintiffs believe that they

were under no duty to read their insurance policy, no matter how clear or attention-grabbing the

policy's language may have been, it is irrelevant because they never read it, and thus, it could not

have grabbed their attention. (*See id*.) Second, because the insurance policy could not have provided them with notice of the sickness effective date (because it had not been read), the only document that could have done so was the Application, which they argue did not so notify them because it failed to draw their attention to the paragraph on the last page. (*See id*. at 3-4, 9.) These contentions suffer from numerous failings.

To start with is plaintiffs' statement that they were under no duty to read their insurance policy. In the context of an insured's reasonable expectations about the language of an insurance policy, this statement may technically be true, given that the Colorado Supreme Court has held that "insureds do not actually have to have read their policies." *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011). That, however, does not save plaintiffs from the language of their insurance policy because the test in Colorado is "what the ordinary reader and purchaser *would* have understood insurance provisions to mean had they been read." *See id*. (emphasis in original, quotation omitted). Effectively, therefore, plaintiffs are charged with knowing and understanding "what the ordinary reader and purchaser *would* have understood" the language of their insurance policy to mean *had it been read*, irrespective of whether or not plaintiffs actually read the policy themselves.

In other words, here, plaintiffs were playing with fire if an ordinary reader would understand their insurance policy to contain an effective date for when sickness claims were covered. As discussed *supra* with respect to the numerous clear and prominent instances in the insurance policy where the sickness effective date is set out and when benefits for sickness take effect, the Court finds that an ordinary reader and purchaser of health insurance would have understood plaintiffs' insurance policy to contain a sickness effective date that made benefits for sicknesses covered as of December

25, 2015.  None of the language concerning the sickness effective date was buried in the insurance policy, and the text of the same was not small or unnoticeable.  The fact that plaintiffs did not read this language, or any other language in the insurance policy, is irrelevant.  *See Bailey*, 255 P.3d at 1051.

Thus, irrespective of the notice provided in the Application, the insurance policy provided plaintiffs with notice of and clearly called their attention to the sickness effective date.  As for the Application itself, arguably, the paragraph containing the sickness effective date is not noteworthy for making any of the terms therein stand out.  But, this argument assumes that the sickness effective date is something that should stand out.  Plaintiffs argue that limiting conditions or exclusionary language should be called to their attention.  (ECF No. 70 at 8.)  As defendants assert in their reply to the motion to dismiss, the sickness effective date is not an exclusion.  *See* Black's Law Dictionary 685 (10th ed. 2014) (defining "exclusion" as "[a]n insurance-policy provision that excepts certain events or conditions from coverage."); *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1029 (Colo. App. 2002) (same).  Here, the sickness effective date sets the coverage period, it does not limit any events or conditions from coverage.  Moreover, at no point have plaintiffs cited any case concluding that an effective date, any effective date, of an insurance policy is an exclusion or a condition of limitation.  (*See generally* ECF No. 70.)  In any event, plaintiffs are still charged with understanding that which an ordinary reader would have understood the Application to mean.  *See Bailey*, 255 P.3d at 1051.  Here, if an ordinary reader had read the last paragraph of the Application, that reader would have understood his or her insurance policy to contain a sickness effective date beginning 15 days after the effective date of the policy.  (*See* ECF No. 45-1 at 5.)

As a result, plaintiffs were clearly informed that their coverage for sickness would not begin until December 25, 2013, and this was a term of their insurance policy.  Therefore, defendants did

not breach the insurance policy by denying benefits for claims incurred prior to December 25, 2013, and plaintiffs' breach of contract claim is DISMISSED as to those benefit claims.

This then leaves defendants' objection to the Magistrate Judge's treatment of Claim One' specifically, the finding that plaintiff's breach of contract claim could proceed with respect to claims for services rendered after the sickness effective date. (ECF No. 71 at 3-11.) The Court rejects defendants' objections to the Magistrate Judge's findings. First, defendants object that the Magistrate Judge's findings ignore the fact that the insurance policy contained two separate effective dates. (*Id*. at 4-7.) The R&R does no such thing. As defendants assert, the Magistrate Judge found that the insurance policy contains two effective dates; one for bodily injuries and one for sicknesses. That is clear from the first page of the insurance policy. (ECF No. 27-2 at 2.) The problem for defendants is that they confuse the clarity of the language regarding the *existence* of two separate effective dates and when those effective dates began, with the lack of clarity in the definitions for pre-existing condition and effective date.

The insurance policy defines a pre-existing condition as "[a] sickness or bodily injury and related complications for which medical advice, consultation, diagnosis, care or treatment was sought, received or recommended from a healthcare practitioner or prescription drugs were prescribed during the 12-month period immediately prior to the *covered person's effective date* …." (ECF No. 27-3 at 21) (emphasis in original, other emphasis removed). This language, thus, excludes coverage for any conditions where treatment was received or drugs prescribed in the 12-month period prior to the insured's effective date. The key term is therefore "effective date" as that term delimits when the 12-month period begins and ends. According to defendants that period ended on December 25, 2013 (the sickness effective date), while plaintiffs argued that it ended on December

12

10, 2013 when the insurance policy became effective.  Fortunately, "effective date" is defined in the insurance policy.  It does so as follows: "[e]ffective date means the first date all the terms and provisions of this policy apply.  It is the date that appears on the cover of this policy or on the date of any amendment, rider or endorsement.  The effective date for sickness will always be on the 15th day after the effective date for bodily injury unless amended."  (ECF No. 27-5 at 20) (emphasis removed).

The definition of "effective date" is where ambiguity arises.  The first sentence of the definition is far from clear, stating only that the policy is effective from the first date that all of its terms apply.  (*Id.*)  The actual date is not provided, and defendants now contend that the entire policy was not in effect until December 25, 2013.  (*See* ECF No. 71 at 9.)  This, however, ignores language in the Application.  In their motion to dismiss, defendants acknowledged that the Application stated, *inter alia*, that the sickness effective date "begins on the 15th day after the *approved effective date of the policy*."  (ECF No. 41 at 2; *see also* ECF No. 45-1 at 5) (emphasis added).  The Application further provided that it would "form part of and be the basis for any policy issued."  (ECF No. 45-1 at 5.)  Thus, to the extent that the insurance policy itself is not clear as to when the effective date of the policy began, the Application is clear: 15 days before the sickness effective date.  Here, as all parties agree, the sickness effective date was December 25, 2013.  Thus, the "approved effective date of the policy" was on December 10, 2015.  The fact that the sickness effective date did not kick in until December 25, 2013 is irrelevant as to when all the terms and provisions of the policy began.  As the Application and the insurance policy make clear the sickness effective date was merely another term of the policy.  *See* Black's Law Dictionary 1698 (defining "term" as "[a] contractual stipulation").  Here, the parties stipulated to coverage for sicknesses becoming effective on

13

December 25, 2013. This is especially so given that the term appears below the heading, "Agreement and Signature." (*See* ECF No. 45-1 at 5.) Defendants' assertion to the contrary is not supported, and, at the very least, fails to explain how the first sentence provides clarity as to the policy's effective date. (*See* ECF No. 71 at 9.)

Nevertheless, the second sentence of the effective-date definition has the potential to make clear the meaning of the first sentence, and thus, the entire definition. This is because the second sentence actually states that which the first sentence only alludes. Specifically, the second sentence states that the first day on which all of the policy's terms apply is "the date that appears on the cover of this policy or on the date of any amendment, rider or endorsement." (ECF No. 27-5 at 20) (emphasis removed). None of the parties have alleged that an amendment, rider, or endorsement is at play here, thus, that part is irrelevant. The important part is "the date that appears on the cover of this policy." (*Id*.) (emphasis removed).

As indicated *supra*, plaintiffs submitted a copy of the insurance policy with the amended complaint. (*See generally* ECF Nos. 27-2-7.) The first page of the submitted policy does not appear to be a cover page, rather it appears to be the beginning of the policy itself. (*See* ECF No. 27-2 at 2.) However, none of the parties have argued that the first page of the submitted policy is not the cover page, or, at the very least, should not be treated as such. Thus, for present purposes, the Court will assume that the first page of the policy is also the cover page. That page, unfortunately, provides no clarity to the situation; instead, it muddies the water to an even greater extent. That is because, as mentioned *supra*, the first page of the insurance policy provides effective dates for two separate forms of coverage; one for bodily injury and one for sickness. (*Id*.) Thus, taking the definition of "effective date" as stated, the purported cover page thoroughly confuses matters because it contains

two effective dates.  This can not be so as there can be only one effective date of the *policy*.  *See* Black's Law Dictionary 478 (defining "effective date" as the date on which an insurance policy "becomes enforceable or otherwise takes effect.").  Moreover, neither the sickness nor the bodily injury effective dates indicate that they are the *policy's* effective date. (*See* ECF No. 27-2 at 2.)  In this light, the second sentence of the "effective date" definition provides no clarity to when that date actually is.

The only remaining sentence is the one that describes when the effective date for sickness falls.  As the Court reads this sentence, it provides no clarity to the underlying confusion concerning the policy's effective date.  As stated, the sentence only applies to the *sickness* effective date; not the *policy's* effective date.  As the Magistrate Judge explained, this is another indication that the sickness effective date is merely a term of the overall policy.  (*See* ECF No. 66 at 22-23.)  Moreover, the fact that the final sentence is separated from those that come before (sentences that attempt to describe the *policy's* effective date), and expressly relates only to the effective date for sickness, rather than *the* effective date for the policy, a plain reading of this sentence arguably suggests that the sickness effective date is a different date to the policy's effective date.  *See Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002) ("The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided.")  That is only one reading of the sentence, however, and, as discussed *supra*, the definition of "effective date" in toto provides no clarity as to the precise date that should be used.  As such, the Court finds the definition to be ambiguous.[5]

---

[5] In this light, contrary to defendants' assertion that the Magistrate Judge "tried to create" an ambiguity (ECF No. 71 at 6, 9), the ambiguity here was created by the language of the policy itself.  Nor does this ambiguity render the sickness effective date "meaningless." (*Id*. at 10-11.)  Contrary to defendants' contention, under the Magistrate Judge's reading of plaintiffs' insurance policy, individuals

Due to the ambiguity in the definition of "effective date," there is arguably more than one possible date on which the effective date for plaintiffs' insurance policy began. As a result, the Court is required to construe the definition of "effective date" against defendants and in favor of coverage. *See Am. Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo. 1991) ("Ambiguous provisions of an insurance contract are to be construed against the drafter thereof and in favor of providing coverage to the insured."). Because one of the possible dates for the policy's effective date is December 10, 2015, and because that date would provide plaintiffs coverage for Aurzadniczek's claims for services rendered on or after December 25, 2013, the Court construes the definition of "effective date" as providing for the policy's effective date beginning on December 10, 2013.[6] With that being the case, the Court agrees with the Magistrate Judge's finding that plaintiffs breach of contract claim may proceed as it pertains to claims for services rendered on or after December 25, 2013. Thus, the Court ADOPTS the Magistrate Judge's findings in that respect in full.

**B.      Claims Two, Three, and Four—Reformation**

All of these claims rely upon reforming the insurance policy on the ground, according to plaintiffs, that defendants engaged in inequitable conduct in causing them to rely upon an email and

---

could *not* receive treatment for sickness prior to the sickness effective date, given that is precisely what the Magistrate Judge found that plaintiffs were not entitled to when the Magistrate Judge limited the breach of contract claim to claims for services rendered after the sickness effective date kicked in. Merely because plaintiffs may be able to receive benefits for claims *after* the sickness effective date does not render that term meaningless, rather, it gives the term its plain meaning.

[6] As such, the Court also agrees with the Magistrate Judge's finding that interpreting the definition of "effective date" and "pre-existing condition" to mean December 25, 2013 would require reading words into those definitions that do not exist in the insurance policy. For example, to read "covered person's effective date" in the definition of "pre-existing condition" as meaning the covered person's *sickness* effective date would require reading sickness into the language. Defendants provide no explanation for why the Court should do this. (*See* ECF No. 71 at 8.) Moreover, given that the final sentence for the definition of "effective date" explains when the "effective date for sickness" occurs, this entire problem could easily have been resolved if, in the definition of "pre-existing condition," the insurance policy had used "the effective date for sickness," rather than just "effective date."

letters, and in deceiving them by "bur[ying] from view in small print" language in the Application. (ECF No. 70 at 7-12.)  The Magistrate Judge recommended denying these claims because there was no indication that defendants had engaged in inequitable or misrepresentative conduct, and plaintiffs mistake about the insurance policy's coverage was unilateral.  (ECF No. 66 at 17-19.)

As indicated *supra* in the context of plaintiffs' breach of contract claim, and just as the Magistrate Judge observed, the Court can discern no inequity in what took place here.  In their objections, plaintiffs rely principally upon the doctrine of reasonable expectations to explain why their conduct was reasonable and defendants' not so.  (ECF No. 70 at 8-10.)  The Court has rejected most of those arguments *supra*.  Notably, the language in the Application with respect to the sickness effective date was not exclusionary, the language was clear, plain, and not buried, and, although plaintiffs may not have been required to read the Application or the insurance policy, they were charged with understanding that which an ordinary person would understand from reading the terms of those documents.  Moreover, with respect to deception, there was nothing deceiving about the language in the Application.  Plaintiffs argue that placing the sickness effective date language under a sub-heading "True and Complete Acknowledgment" was deceiving because it did not indicate it would contain policy terms or limitations.  (*Id*. at 9.)  This is entirely inaccurate.  First, the above-mentioned sub-heading was itself under the heading "Agreement and Signature"; a heading which does indicate that terms and conditions may appear below it.[7]  (*See* ECF No. 45-1 at 5.)  Second, directly below the paragraph containing the sickness effective date language was the italicized sentence: "This document, together with any supplements, will form part of and be the basis for any

---

[7] Moreover, the definition of "acknowledgment" is "acceptance of the truth or existence of something."  New Oxford American Dictionary 13 (3d ed. Oxford Univ. Press 2010).  Thus, an ordinary person would understand that under a heading containing the word "Acknowledgment" there may be things of which he or she was accepting the truth, such as when the sickness effective date began.

policy issued." (*Id*.)  Thus, plaintiffs were notified that the Application would form part of their

insurance policy.

To the extent that defendants argue that they were deceived by the receipt of an email and

letters, stating that the policy and coverage was effective as of December 10, 2013 (*see* ECF No. 70

at 10-11), this misplaces those documents.  In other words, in a *vacuum*, those documents could

indicate to an individual that their insurance policy and health coverage was effective on December

10, 2013.  However, plaintiffs were not operating in a vacuum because the Application had clearly

set forth that the effective date for sickness would begin 15 days after the policy's effective date.

Moreover, as the Magistrate Judge noted, one of the letters asked plaintiffs to log onto defendants'

website to view their insurance plan documents.  (*See* ECF No. 45-5; ECF No. 66 at 18.)  Although

plaintiffs can argue that they were not required to do this, if an ordinary person had done so, that

person would have understood that not all coverages began on December 10, 2013.  *See Bailey*, 255

P.3d at 1054 (explaining that substantive deception is viewed from "how a 'normal' person" would

understand provisions in an insurance document).[8]

Nor is deceiving the fact that plaintiffs were required to pay a full monthly premium in

December 2013, even though there was no sickness coverage until December 25, 2013.  (*See* ECF

No. 70 at 11.)  As before, in a *vacuum*, paying a full premium while not receiving coverage for a

certain type of benefits may have seemed unusual, but, that is only if a person had not read the

Application or the policy, which specifically make clear that one of the terms of the same was that

---

[8] Nor can plaintiffs argue that, even if an effective date was an exclusion, they were procedurally
deceived because the insurance policy clearly and boldly set forth that there were different dates for bodily
injury coverage and sickness coverage.  (*See* ECF No. 27-2 at 2); *see also Bailey*, 255 P.3d at 1054-55
(assessing procedural deception from whether the agreement in question adequately communicated
coverage exclusions).

sickness coverage would begin 15 days after the insurance policy began. Plaintiffs' premium payment was based upon the insurance policy beginning on December 10, 2013, including the term that sickness coverage would not begin immediately. As the Court explained *supra* with respect to defendants' arguments against the breach of contract claim, the policy could not have two effective dates. Here, the effective date for the *policy* was December 10, 2013, and that is why plaintiffs were making premium payments in full in December 2013.

Ultimately, as the Magistrate Judge observed, "[t]he failure of [p]laintiffs to adequately inspect the Application and the Policy does not in itself impute fraudulent or inequitable conduct to [defendants]." (ECF No. 66 at 18.) It is for this reason that plaintiffs various reasons for reforming the insurance policy fail because, contrary to their contentions, they should not have been ignorant of the true facts, and defendants did not misrepresent anything to them that should have been read. To the extent that plaintiffs did not read their own policy documents, even under the doctrine of reasonable expectations, they were still required to understand from those documents that which an ordinary person would understand by reading them. *See Bailey*, 255 P.3d at 1051. Here, plaintiffs allege that the only thing that they understood was that their entire health coverage began on December 10, 2013, and they understood this by reading just the email and letters from defendants and/or defendants' agent. That is not enough, though, when the policy documents can be clearly understood to establish a sickness effective date starting on December 25, 2013. *See id.*

As a result, the Court agrees with the Magistrate Judge's recommendation to dismiss Claims Two, Three, and Four, and ADOPTS the same.

## C.    Claim Five—Negligent Misrepresentation

As the Magistrate Judge noted, in order to state a claim for negligent misrepresentation, plaintiffs must, *inter alia*, allege facts that defendants made a material misrepresentation; with a

misrepresentation meaning a false statement of fact. (ECF No. 66 at 9.)  As discussed *supra*, there were no misrepresentations in the Application or the policy, and plaintiffs do not so contend. (*See* ECF No. 70 at 13.)  Instead, they rely on an email and letters as misrepresenting when coverage began and/or changed the date when sickness coverage began to December 10, 2013. (*Id*. at 13-15.) As with the claims discussed *supra*, this argument again hinges on plaintiffs belief that they were not required to read the Application or the insurance policy. (*See id*. at 14.)  Plaintiffs contend that they are not charged "with a duty to read the policy." (*Id*.)  Whether or not *Bailey* can be interpreted to charge insureds with reading their policy documents, at the very least, *Bailey* charges them with understanding that which an ordinary person would understand from reading those documents.  *See Bailey*, 255 P.3d at 1051.  As discussed repeatedly *supra*, here, that means that plaintiffs were charged with understanding that their coverage for sicknesses did not begin until December 25, 2013. The fact that an ordinary person would have understood this by reading the Application and the insurance policy, necessarily means that defendants did not suppress this fact and that plaintiffs should have been aware of it.[9]

---

[9] Plaintiffs cite to a securities case from the U.S. Supreme Court to support their arguments in this regard. (*See* ECF No. 70 at 13.)  However, that case merely explains that, under Iowa law, "[a] statement in a business transaction which, while stating the truth so far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation." *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co.*, 312 U.S. 410, 425, 61 S.Ct. 623 (1941).  Reliance on this case again reflects plaintiffs' reliance on their belief that they did not need to read or at least understand the ordinary meaning of their policy documents.  That is not the case.  Here, the Application and the insurance policy did not fail to state "qualifying matter," to the extent that the sickness effective date is qualifying matter, because those documents disclosed that term.  The mere fact that the email and letters did not disclose the sickness effective date is only, arguably, misleading if plaintiffs are not charged with understanding the ordinary meaning of their policy documents, which predated the email and letters. Similarly, the cases that plaintiffs distinguish and those to which they cite elsewhere in their objections (*see* ECF No. 70 at 15-18) do not help their cause because the underlying premise upon which plaintiffs rely for all of those cases is that they were not aware of the sickness effective date. (*See id*.)  As discussed *supra*, this is irrelevant in light of *Bailey's* instruction that the doctrine of reasonable expectations inquires into the ordinary person's understanding of an insurance policy's meaning.  *See Bailey*, 255 P.3d at 1051.

Plaintiffs argument that the email and letters "changed the sickness date" is also meritless. Apart from the principle that parol evidence is only admissible if a contract's terms are ambiguous, *see Strickland Tower Maint., Inc. v. AT & T Commc'ns, Inc.*, 128 F.3d 1422, 1427 (10th Cir. 1997) (stating that the district court properly admitted parol evidence to illuminate the parties' meaning of an ambiguous term), and here, the Application and insurance policy are not ambiguous as to the existence of a sickness effective date, the email and letters do not change the sickness effective date. Rather, as plaintiffs acknowledge, they speak only to the coverage or policy effective date beginning on December 10, 2013. (*See* ECF Nos. 45-4-5.) This is entirely consistent with the Application and the insurance policy, as the policy and coverage did begin on December 10, 2015.  The fact that this related only to bodily injuries does not mean the letters were inconsistent because, by the time that plaintiffs received the email and letters, an ordinary person would have understood that the sickness effective date did not begin until 15 days after the effective date of the policy.  (*See* ECF No. 45-1 at 5.)   Moreover, "[m]odification of an agreement requires the mutual consent of the parties involved," and such consent can be either explicit or implied from conduct.  *Reynolds v. Farber*, 577 P.2d 318, 321 (Colo. App. 1978).  Here, the email and letters did not explicitly modify the insurance policy, given that the phrase "sickness effective date" is not included therein.  In addition, as the Magistrate Judge observed with respect to the reformation claims, defendants disavowed any suggestion that the sickness effective date was not December 25, 2013 when defendants denied plaintiffs' claims for services rendered on December 19, 2013. (*See* ECF No. 66 at 19; *see also* ECF No. 27 at ¶ 16.)  Thus, defendants' conduct did not imply modification of the insurance policy.

As a result, the Court agrees with the Magistrate Judge's finding that plaintiffs failed to allege any misrepresentation of material fact, and thus, ADOPTS the Magistrate Judge's recommendation to dismiss Claim Five.

### D.    Claims Six and Seven—Common Law and Statutory Bad Faith

The Magistrate Judge recommended denying the motion to dismiss with respect to Claims

Six and Seven.  (ECF No. 66 at 27.)  Specifically, the Magistrate Judge found that, because

plaintiffs' interpretation of the insurance policy—that the effective date for purposes of pre-existing

conditions was December 10, 2013—was reasonable, and plaintiffs alleged that defendants pre-

approved and later denied plaintiffs' claims for benefits, there were sufficient facts to support a claim

that defendants acted in bad faith.  (*Id*.)  Defendants object to the Magistrate Judge's findings

because bad faith requires more than the mere fact that they arguably breached the insurance policy.

(ECF No. 71 at 12-13.)  Defendants assert that bad faith requires a showing that they "unreasonably

denied [plaintiffs'] claims," and their interpretation of the pre-existing condition term was "just as

plausible" as plaintiffs'.  (*Id*. at 13 (emphasis removed)).

Here, the important factor is that, at this juncture, the Court is required to construe all

allegations in the light most favorable to plaintiffs and draw all reasonable inferences in their favor.

*See Brokers' Choice*, 757 F.3d at 1135-36; *Mink*, 613 F.3d at 1000.  As discussed *supra*, each party

has a very different interpretation of how "effective date" should be treated in the definition of pre-

existing condition.  Because that term is ambiguous, and because plaintiffs' interpretation is at least

to some extent supported by the language used in both the Application and the insurance policy, the

Court agreed with the Magistrate Judge's recommendation to allow the breach of contract claim to

proceed with respect to claims for services rendered on or after December 25, 2013.  The question

now is whether defendants' interpretation of the same language was unreasonable because, as

defendants acknowledge, if an insureds health claim is denied without a reasonable basis, the insurer

has engaged in bad faith.  (*See* ECF No. 66 at 26; ECF No. 71 at 12-13.)

Drawing all reasonable inferences from the allegations in the amended complaint in plaintiffs' favor, at this juncture, a jury could find that defendants unreasonably denied plaintiffs' claims for services rendered on or after December 25, 2013. Notably, in the amended complaint, plaintiffs allege that "much" of the care that Aurzadniczek received after December 26, 2013 was "pre-approved" by defendants. (*See* ECF No. 27 at ¶ 15.) Drawing all reasonable inferences from this allegation in favor of plaintiffs, a reasonable juror could find that defendants pre-approved these claims because defendants believed that the pre-existing condition clause did not apply.

In addition, at this juncture, the Court has not found that either plaintiffs' or defendants' interpretation of the pre-existing condition clause is more or less plausible; the Court has only found that those are two possible interpretations of the clause. However, in light of the language in the Application and the insurance policy that gives support to plaintiffs' interpretation, and construing the inferences that may be drawn from that language in plaintiffs' favor, a jury could find that defendants' contrary interpretation was not reasonable, and thus, defendants did not deny plaintiffs' post-December 25, 2013 claims on a reasonable basis. *See Zolman v. Pinnacol Assur.*, 261 P.3d 490, 496-497 (Colo. App. 2011) (explaining that an insurer engages in bad faith "only if it has intentionally denied, failed to process, or failed to pay a claim without a reasonable basis."); *Pres. at the Fort, Ltd. v. Prudential Huntoon Paige Assocs.*, 129 P.3d 1015, 1017-18 (Colo. App. 2004) (stating that, if a contract is "susceptible of more than one reasonable interpretation, it is ambiguous, and its meaning must be determined as an issue of fact.").

As a result, the Court ADOPTS the Magistrate Judge's recommendation to deny the motion to dismiss with respect to Claims Six and Seven.[10]

---

[10] Defendants do not appear to object to the Magistrate Judge's recommendation to deny Claim Seven for any reason other than their objection to the denial of Claim Six. (*See* ECF No. 71 at 12-13.)

E.      **Claim Eight—Willful and Wanton Breach of Contract**

The Magistrate Judge recommended denying Claim Eight because Colorado case law does not create a distinct cause of action for willful and wanton breach of contract; instead, it is merely a measure of damages available for a breach of contract claim.  (ECF No. 66 at 25.)  Plaintiffs object to this recommendation because a Colorado court has directed judgment be entered on a willful and wanton breach of contract claim.  (ECF No. 70 at 19.)

The Court agrees with the Magistrate Judge's recommendation.  As defendants assert in their response to plaintiffs' objections, the Colorado Revised Statutes demonstrate that an allegation of willful and wanton breach of contract is merely a way of obtaining damages for noneconomic loss or injury.[11]  *See* Colo. Rev. Stat. § 13-21-102.5(6)(a)(I)(B) (providing that "[i]n any claim for breach of contract, damages for noneconomic loss or injury or for derivative noneconomic loss or injury are recoverable only if … [i]n any first-party claim brought against an insurer for breach of an insurance contract, the plaintiff demonstrates by clear and convincing evidence that the defendant committed willful and wanton breach of contract.").  The Court does not find pertinent plaintiffs' citation to *Geiger v. Am. Standard Ins. Co. of Wisconsin*, 192 P.3d 480 (Colo. App. 2008), given that the court in that case was not faced with the question of whether an allegation of willful and wanton breach of contract was a standalone claim or a component of damages.  *See generally id*. at 482-485. Moreover, the *Geiger* court relies for much of its discussion of willful and wanton breach of contract on *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230 (Colo. 2003).  In *Giampapa*, the Colorado

---

Moreover, as the Magistrate Judge noted, statutory bad faith and common law bad faith share a requirement of reasonableness under the circumstances.  (*See* ECF No. 66 at 28.)  Thus, for the reasons explained *supra* with respect to Claim Six, the Court agrees with the recommendation to denial dismissal as to Claim Seven.

[11] Although not pertinent to the Court's analysis, plaintiffs failed to reply to this argument in their reply to defendants' response.  (*See* ECF No. 81 at 14-15.)

Supreme Court expressly framed the issues before it with respect to willful and wanton breach of contract as "when and to what extent non-economic damages are available *in a contract claim* in the insurance context," and "whether the original jury properly awarded Giampapa non-economic damages under his *common law contract claim*." *Id.* at 243 (emphasis added). In addition, throughout its opinion, the Colorado Supreme Court refers to willful and wanton breach of contract as a "rule"; not a claim. *See generally id.* at 238-244.

Thus, in light of Colorado statutory law and the discussion in *Giampapa*, the Court agrees with the Magistrate Judge's recommendation to dismiss Claim Eight, and ADOPTS the same. The Court notes, however, that although Claim Eight has been dismissed, plaintiffs will still be able to argue for noneconomic damages due to willful and wanton breach of contract should they succeed on their underlying breach of contract claim. *See* Colo. Rev. Stat. § 13-21-102.5(6)(a)(I)(B).

### F.       Claim Nine—Violation of the CCPA

The Magistrate Judge recommended dismissing Claim Nine because plaintiffs failed to allege facts showing that defendants had engaged in any unfair or deceptive trade practices. (ECF No. 66 at 13-16.) Plaintiffs object to this recommendation on the ground that defendants' communications with plaintiffs contained misrepresentations. (ECF No. 70 at 18-19.) Plaintiffs also argue that defendants' internet ads induced them "through misleading price information to buy a policy with all coverages from inception and they received a different policy with no sickness coverage from inception." (*Id.* at 19.)

For the reasons discussed *supra*, which the Court will not go into once again, defendants did not misrepresent anything to plaintiffs in the email or letters that were sent after the submission of the Application. The Court also rejects plaintiffs' argument that defendants made false statements

in an "enrollment form," by purportedly stating that plaintiffs "were getting all policy benefits for each day that month." (*Id*. at 18.)  The enrollment form, which is attached to plaintiffs' response to the motion to dismiss, stated nothing of the sort.  The enrollment form merely contains the amount owed, applicant and payer information, payment options and authorization, and information pertaining to the enrollment in an association providing educational information and discounts on goods and services.  (*See generally* ECF No. 45-2.)  Nowhere does it state that, by authorizing the payment of the amount owed, plaintiffs were obtaining benefits to which their policy documents did not entitle them until December 25, 2013.

As for plaintiffs' allegations regarding internet price advertising, they appear to be based upon the same assumption discussed *supra* with respect to whether plaintiffs' paying a full premium for their health insurance was deceiving.  As discussed there, plaintiffs' premium payment was not deceptive or misleading because that payment amount was based upon the entirety of the insurance policy's terms and conditions; not just the effective date of the policy.  One of those terms was that coverage for sicknesses would not begin until December 25, 2013.  An ordinary person reading that term, as well as the entire policy, would not have been deceived or misled as to what their premium payment was providing them.  *See Sanchez v. Connecticut Gen. Life Ins. Co.*, 681 P.2d 974, 977 (Colo. App. 2004) ("Application of [the rule of reasonable expectation] requires an analysis of the totality of the circumstances involved in the transaction from the point of view of an ordinary layperson.").  Moreover, the amended complaint is far from clear as to precisely what was advertised.  Plaintiffs allege as follows: "Beard saw advertising on the eHealth website indicating what the monthly premium price was for a policy of insurance with [defendants]. [Beard] understood and reasonably expected from this advertisement that all coverages provided for under the policy to

be issued by [defendants] would be effective on the date the policy first became effective for the price so advertised." (ECF No. 27 at ¶ 7; *see also id*. at ¶ 75.) Notably, plaintiffs do not allege what caused Beard to understand and reasonably expect from the advertisement that all coverages would begin on the policy's effective date, other than the premium price itself. For example, plaintiffs do not allege that the advertisement actually stated that insureds would receive coverage for all benefits from the date of the policy's inception. As such, apart from there being nothing misleading about the premium price alone, plaintiffs have failed to allege sufficient factual matter to raise their entitlement to relief to the level of plausibility. *See Twombly*, 550 U.S. at 555-556.

As a result, the Court ADOPTS the Magistrate Judge's recommendation to dismiss Claim Nine.

### G. Claim Ten—Loss of Consortium

The Magistrate Judge recommended denying the motion to dismiss with respect to Claim Ten because the claim was derivative of plaintiffs' bad faith claims, which the Magistrate Judge found to be sufficient. (ECF No. 66 at 28-29.) Defendants object to this recommendation on the ground that, because they argued that there had been no breach of contract or bad faith, there could be no claim for loss of consortium. (ECF No. 71 at 13.) As such, defendants do not appear to object to the Magistrate Judge's underlying reasoning for recommending denial of the motion to dismiss as to Claim Ten, rather, defendants object to the Magistrate Judge's reliance upon plaintiffs' bad faith claims in order to allow the loss of consortium claim to proceed.

If the Court had disagreed with the Magistrate Judge's findings and recommendations with respect to the bad faith claims, i.e., by dismissing those claims, then defendants' objection to the Magistrate Judge's resolution of Claim Ten may have been meritorious. However, as discussed

*supra*, the Court agreed with the Magistrate Judge's recommendation to allow plaintiffs' claims for common law and statutory bad faith (Claims Six and Seven) to proceed.  Thus, because the Court discerns no other objection to the Magistrate Judge's recommendation to deny the motion to dismiss with respect Claim Ten, the same is ADOPTED.

## VI.    Conclusion

For the reasons discussed herein, the Court:

(1)    REJECTS plaintiffs' objections to the R&R (ECF No. 70);

(2)    REJECTS defendants' objections to the R&R (ECF No. 71);

(3)    ADOPTS IN FULL the R&R (ECF No. 44) as it pertains to defendants' motion to dismiss, and finds the R&R to be MOOT as it relates to eHealth;

(4)    DENIES as MOOT eHealth's motion to dismiss (ECF No. 42); and

(5)    GRANTS IN PART and DENIES IN PART defendants' motion to dismiss (ECF No. 41); *to wit*,

(a)    GRANTS defendants' motion to dismiss with respect to: Claim One, however, only as that claim pertains to plaintiffs' claims for services rendered prior to December 25, 2013; Claim Two; Claim Three; Claim Four; Claim Five; Claim Eight; and Claim Nine; and

(b)    DENIES defendants' motion to dismiss with respect to: Claim One, as that claim relates to plaintiffs' claims for services rendered on or after December 25, 2013; Claim Six; Claim Seven; and Claim Ten.

The only other matter pending before the Court is plaintiffs' and defendants' "Status Report and Joint Motion" ("the Joint Motion").  (ECF No. 69.)  Therein, the parties request 30 days from

this Opinion to file a proposed scheduling order, hold a scheduling conference, begin discovery, and make disclosures.  (*Id*. at 2.)  As this Opinion will now be filed, the Court considers the requests in the Joint Motion to be MOOT, and the Joint Motion (ECF No. 69) is DENIED on that basis.  **The parties shall have seven (7) days from entry of this Opinion to file a revised joint proposed scheduling order.**[12]  **To the extent the parties believe discovery to be stayed (***see*** ECF No. 72 at 11), that is not the case, and discovery is no longer stayed.**  The Court refers the setting of a scheduling conference and entry of a scheduling order to the Magistrate Judge.

      **SO ORDERED.**

      DATED this 1st day of April, 2016.

BY THE COURT:

_____

RAYMOND P. MOORE
United States District Judge

---

[12] The Court notes that the parties filed a joint proposed scheduling order on March 9, 2016.  (ECF No. 72.)  Given that the issues in this case have now been crystallized, the parties shall provide, *inter alia*, specific dates for the conclusion of discovery and the filing of dispositive motions in the revised joint proposed scheduling order.